*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 21, 2020

**By ECF**

The Honorable Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    United States v. Damon Chappelle, 13 Cr. 986 (LTS)

Dear Judge Swain:

      The Government writes in advance of the re-sentencing of defendant Damon Chappelle for his participation in planning and executing what he believed would be an armed robbery of rival drug dealers, as charged in the above-referenced Indictment. For this conduct, the defendant initially pled guilty to one count of conspiring to interfere with commerce by threats of violence (the "Hobbs Act Robbery Count" or "Count Two") and one count of conspiring to possess a firearm in connection with that robbery (the "Section 924(c) Count" or "Count Three") and received a sentence of 180 months' imprisonment. While the Second Circuit has recently vacated the defendant's 924(c) Count in light of *United States v. Davis*, 139 S. Ct. 2319 (2019), as detailed herein, and consistent with the independent calculation conducted by the U.S. Probation Department ("Probation"), the defendant's recalculated Guidelines range of 151 to 188 months' imprisonment remains consistent with the original sentence imposed. Because nothing about the defendant's offense conduct, his extensive criminal history, or any of the factors set forth in Title 18, United States Code, Section 3553(a), has changed, the Government respectfully submits that the sentence, as originally imposed, remains appropriate and sufficient but not greater than necessary to promote the legitimate ends of sentencing.[1]

    **I.**    **Relevant Facts**

    **A. The Offense Conduct**

      The defendant was initially charged, along with five others, by criminal complaint in November 2013 with conspiring to commit an armed robbery of drug dealers. (Presentence Investigative Report ("PSR") ¶¶ 156-31.) The charges stemmed from a multi-month DEA

---

[1] As detailed herein, the Government further submits that even if the Court adopts the defendant's Guidelines calculation that a sentence of 180 months' imprisonment remains appropriate given the nature and seriousness of the offense conduct, the defendant's extensive criminal history, and the need to both protect society and deter this defendant from future criminal conduct.

investigation into individuals believed to be involved in committing armed robberies of fellow drug dealers. As that investigation made clear, this defendant was among the leaders of the robbery crew intimately involved in planning and orchestrating the intended armed robbery. (*E.g.*, *id.* ¶¶ 22, 24, 28-29.) At the time of their arrest, the defendants – who were stopped while en route to the location at which they planned to ambush and potentially kill a group of rival drug dealers before stealing more than 30 kilograms of cocaine and heroin – had five firearms with them, as well as ski masks, plastic gloves, handcuffs, and plastic "zip ties" or "flex cuffs" used as restraints. Four of the five firearms were loaded. (*Id.* ¶¶ 29-31.)

As detailed more fully in the criminal complaint and PSR, the investigation involved multiple recorded meetings, virtually all of which involved this defendant. For example, on October 24, 2013, the defendant and co-defendant Charles Bonner met with a cooperating witness posing as narcotics trafficker with insider information on a load of drugs the defendants could rob ("CW-1"). During that initial meeting, the defendant and Bonner made clear that they were experienced drug traffickers capable of re-selling the dozens of kilograms of cocaine and heroin the defendants planned to steal at gun point. "I can move like 10 [kilograms] a week easy," Bonner told CW-1 during that initial meeting. "I can move the heroin or the coke, but it has got to be grade A."

With respect to the robbery itself, the defendant and Bonner emphasized from the outset that they had a crew – "we got about four," the defendant told CW-1 – and that they would be armed. "Let me ask you a question, can ya'll get me silencer," Bonner asked CW-1. "Cause I could just leave it right there. Like it can be just like that." When CW-1 indicated that he did not have silencers, the defendant and Bonner nonetheless made clear they would armed and would be prepared to use violence to commit the robbery. "I want [it] to be as least messy as possible," the defendant replied. "But if it comes to that, it comes to that."

On November 7, the defendant and Bonner met again with CW-1 to continue discussions regarding the proposed robbery. This time, the defendant and Bonner were joined by co-defendant Jamil Speller. During that meeting, the defendant sought to confirm the quantity of narcotics and the number of victims who would be transporting the drugs. Consistent with his role as one of the leaders of the crew, the defendant also discussed the specifics of how the crew would conduct the robbery, including where it would occur and how they would attempt to catch the victims off guard. The defendant and Bonner also led discussions with CW-1 about the "split" of proceeds, agreeing that the defendant and his crew would keep 60 percent of the robbery proceeds. Most important, for present purposes, the defendant and his co-conspirators reaffirmed that they would be armed. "Here's the thing," Bonner told CW-1 in the presence of the defendant. "[T]his is real shit, shit can get ugly out there," adding, "I'm hip, I'm ready."

The robbery was scheduled to occur on November 18, 2013, and that day the defendant's robbery crew traveled in three vehicles from Philadelphia to New York. For this trip, the defendant, Bonner, and Speller were joined by Raheem Jefferson. (*Id.* ¶¶ 24-25.) Upon arriving in New York City, members of the crew met several times with CW-1 to further discuss details of the planned robbery they planned to do that evening. During that meeting, the defendant made clear that, if things went well, he wanted to do additional robberies with CW-1 in the future. "I want to get a relationship with you," the defendant said, adding that the drug business in

Philadelphia was slow.  "We're dry down here. . . . So like I'm not going to fuck [this job] up. . . . I want to keep the relationship going."  At the direction of law enforcement CW-1 also gave the defendant another opportunity to back out – to not go through with the crime – and to walk away.  "I can't let it go," Bonner said to the agreement of others.  "We've come too far to let it go."

At the direction of law enforcement, CW-1 then indicated to the crew that the robbery victims were en route to the robbery location, at which point the crew, including this defendant, returned to their vehicles and followed CW-1 out of the parking lot and toward the planned robbery location.  The crew never made it that far – instead, the crew was met by federal agents who stopped their vehicles and placed them under arrest.

At the time of the arrests, the defendant was traveling in a Lincoln pickup truck with co-defendant Jefferson.  In a secret compartment or "trap" in that Lincoln, agents recovered four firearms – a Ruger .9 mm pistol, a Llama .45 caliber handgun, an FNH 5.7 handgun, and a Glock 23 .40 caliber handgun – all of which were loaded.  The serial number on the Ruger .9 mm pistol appeared to have been defaced.  In the other cars being used by the crew, agents found ski masks, zip ties or "flex cuffs" frequently used as restraints, and a fifth firearm, this one unloaded, in another secret compartment or "trap" large enough to hold the 30 or more kilograms of drugs the defendants intended to steal at gunpoint that evening.  (*Id.* ¶¶ 29-31.)  In car being driven by Zykia Speller, agents found a fifth, unloaded firearm.

On December 18, 2013, a grand jury returned indictment 13 Cr. 986 (LTS), which charged the defendant with one count of conspiracy to distribute narcotics in violation of Title 21, United States Code, Section 846; one count of conspiracy to commit Hobbs Act robbery in violation of Title 18, United States Code, Section 1951; and one count of possession of a firearm in connection with the narcotics crime charged in Count One and the crime of violence charged in Count Two, in violation of Title 18, United States Code, Section 924(c).  (*Id.* ¶¶ 1-4.)

### B. The Original Plea and Sentencing Proceedings

On December 23, 2014, the defendant appeared before Your Honor to plead guilty pursuant to an agreement with the Government.  As a condition of that agreement, the Government accepted the defendant's guilty plea to Counts Two and Three of the Indictment and, as detailed further below, the parties agreed that the defendant's advisory, applicable Guidelines' range on Count Two was 262 to 327 months' imprisonment.  Of some significance, while the defendant was not require to allocute to Count One, in his plea agreement, the defendant acknowledged that the purpose of the robbery was the "taking of a controlled substance."

On September 21, 2015, the defendant appeared before Your Honor for sentencing.  At that proceeding, and after hearing from the parties and the defendant himself, the Court imposed a sentence principally of 180 months' imprisonment. (Dkt. 225). In imposing sentence, this Court noted the seriousness of the offense conduct and the defendant's extensive criminal history.  With respect to the former, the Court noted that the defendant "was among the leaders of the robbery crew and was intimately involved in planning and orchestrating the intended robbery" adding that while this was a sting operation, "Mr. Chappelle's crimes are very serious, indeed."  (*Id.* at 28-29.)  With respect to the latter, while noting the "very complex picture" presented by the defendant's

background, the Court also noted that the defendant "is now 40 years old and has spent a substantial portion of his adult life in state and federal prisons on convictions for criminal activities involving drugs and guns." (*Id.* at 29). The Court then imposed a sentence of 180 months' imprisonment, to be followed by a term of five years' supervised release.

### C. The Appeal

Notwithstanding the appellate waiver set forth in the parties' plea agreement, the defendant appealed challenging, in relevant part, his conviction on Count Three on the basis of *Johnson v. United States*, 576 U.S. 591 (2015) and its progeny. In May 2020, on the basis of the Supreme Court's recent decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), the Second Circuit vacated that count and remanded for resentencing on the remaining Hobbs Act Robbery Count.

## II. The Sentencing Guidelines

As set forth in the parties' plea agreement and as recently confirmed by the Probation Department, notwithstanding the vacateur of Count Three, the defendant remains a career offender because the instant offense was a "crime of violence" for purposes of U.S.S.G. § 4B1.1, and prior to the instant offense, the defendant sustained two prior convictions for either crimes of violence or controlled substance offenses.

Specifically, prior to the instant offense, the defendant was convicted in 1996 Pennsylvania state robbery conviction, a crime of violence within the meaning of Section 4B1.2(a); and a 2002 federal conviction for conspiring to distribute crack cocaine, a controlled substance offense within the meaning of Section 4B1.2(b). Accordingly, the defendant's applicable Guidelines' range is 151-188 months' imprisonment. (Revised PSR at 2.)

The defendant challenges this conclusion on two grounds. First, he contends his 1996 Pennsylvania robbery conviction is not a "crime of violence" within the meaning of Section 4B1.2 because even assuming the modified categorical approach applies, a conclusion the defendant purports to contest, no so-called *Shepard* documents exist to establish which of the robbery statute's five sub-divisions the defendant was convicted of. Second, the defendant contends his current offense, the Hobbs Act Robbery Count, is no longer a "crime of violence" for purposes of triggering the Career Offender Guidelines because it is a conspiracy rather than a substantive count. Neither argument has merit.

### A. The Pennsylvania State Robbery Conviction[2]

---

[2] Because the defendant not only agreed that the 1996 Pennsylvania robbery conviction constituted a crime of violence as a condition of his plea agreement but also failed to challenge this Court's similar conclusion at the original sentencing based on this issue on appeal, he has at least arguably waived any right to challenge to it on remand. In particular, under the law of the case doctrine, "a decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of case; the parties are deemed to have waived the right to challenge that decision." *United States v. Ben Zvi*, 242 F.3d 89, 96 (2d Cir. 2001) (quoting *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997)). Nevertheless, and

First, the defendant contends that his 1996 Pennsylvania robbery conviction fails to qualify as a "crime of violence" for purposes of the Career Offender Guidelines because (1) the statute is "indivisible" and, on its face, not a crime of violence under the categorical approach; or (2) is divisible, but the "modified categorical approach" cannot be applied without more information about which of the state statute's various sub-divisions the defendant was convicted of.

At all times relevant to Chappelle's conviction, Section 3701(a) of the Pennsylvania code stated:

(1) A person is guilty of robbery if, in the course of committing a theft, he:

    (i) inflicts serious bodily injury upon another;

    (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

    (iii) commits or threatens immediately to commit any felony of the first or second degree;

    (iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or

    (v) physically takes or removes property from the person of another by force however slight.

*See* 18 Pa. Cons. Stat. § 3701(a) (June 24, 1976 to May 16, 2010). The grading provision provided that: "[r]obbery under subsection (a)(1)(iv) is a felony of the second degree; robbery under subsection (a)(1)(v) is a felony in the third degree; otherwise, it is a felony of the first degree." *Id.* § 3701(b); *see also United States v. Peppers*, 899 F.3d 211, 231 (3d Cir. 2018)(same). Moreover, state penalty provisions provided for a five-year mandatory minimum for any violation of sub-divisions (a)(1), a(2) and a(3). *See* 18 Pa. Cons. Stat. § 9712.

With respect to the first argument – which relies principally on two 2017 district court opinion from the Eastern District of Pennsylvania – as the defendant concedes, the Third Circuit has reached the opposite conclusion. In particular, the Third Circuit has found that "'[g]iven the clearly laid out alternative elements of the Pennsylvania robbery statute, it is obviously divisible and, therefore, a sentencing court can properly look to the kinds of documents listed by the Supreme Court in . . . *Shepard* to determine which subsection was the basis of [the defendant's] prior convictions.'" *Peppers*, 899 F.3d at 232 (quoting *United States v. Blair*, 734 F.3d 218, 225 (3d Cir. 2013)) (alterations in original).[3] The Third Circuit's reasoning is consistent with the

---

without conceding the claim is preserved, the Government proceeds to address the claim on the merits.

[3] Given the Third Circuit's 2013 decision in *Blair*, it appears the two district court opinions relied upon by the defendant may have been contrary to established Third Circuit law when they were

statutory text and Supreme Court precedent, *see id.* (citing *Mathis v. United States*, 136 S. Ct. 2243 (2016); *Shepard v. United States*, 544 U.S. 13 (2005)), and the defendant identifies no persuasive reason to disregard what, in any event, would be more relevant authority for this Court, in favor of the two district court opinions that reached the opposite conclusion.

Turning to the second argument, as noted above, when a statute is divisible because it comprises multiple, alternative versions of a crime, sentencing courts can resort to the "modified categorical approach" to determine whether a defendant's prior conviction qualifies as a predicate offenses under the career offender Guidelines. *See Peppers*, 899 F.3d at 237. To make that determination, courts can look to certain "extra-statutory materials" known as *Shepard* documents. *Id.*; *see also Shepard*, 544 U.S. at 13. These include "the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record." *Id.* at 26. After consulting *Shepard* documents to determine which sub-division the defendant was convicted of, the sentencing court then resorts to the traditional categorical approach that requires comparing the criminal statute to the relevant generic offense. *Peppers*, 899 F.3d at 237.

Here, the Government has endeavored to retrieve from state court available records regarding the defendant's 1996 conviction. To date, the Government has been able to obtain the "charging documents" as well as the state court document reflecting the defendant's guilty plea.[4] Those documents, which are attached as Exhibit A, and which are within the ambit of *Shepard*, establish that the defendant was convicted of robbery in the first degree and, more specifically, that he was charged with violating subdivision (a)(1)(ii), which the Third Circuit has previously concluded constitutes a crime of violence. *See United States v. Heng Khim*, 748 F. App'x 440, 444 (3d Cir. 2018) ("Examining the text of § 3701(a)(1)(ii), we readily conclude that first-degree felony robbery during which a defendant 'threatens another with or intentionally puts him in fear of immediate serious bodily injury,' categorically involves the use or attempted use of physical force.").

First, while the Criminal Information filed against the defendant included the full language of the robbery statute, including each sub-division as may well be common practice, Ex. A at 3, the original and more detailed charging instrument, the criminal complaint filed by the District Attorney's Office, is more specific and parrots the language of sub-section (a)(1)(ii) – that is, that in the course of committing a theft, the "defendant *did threaten or intentionally put another in fear of serious bodily injury/bodily injury* by approaching the complainant . . . and producing firearms, which [defendant] is not licensed to carry, placing a sawed-off shotgun to his side, and a revolver to his head, demanding jewelry, snatching a gold chain from his neck and takin 2 beepers and a

---

decided. But irrespective, given *Peppers* among other Third Circuit opinions since then, they have certainly since been overruled.

[4] Thus far the Government has been able to obtain from its own records documents obtained from the state in 2014 in connection with a potential Rule 404(b) motion in this case. The Government has also made a more recent request of the state in connection with the instant proceedings for, among other things, any further transcript of record of the defendant's plea proceeding. The Government has not yet received anything back in response to that request but will promptly provide any additional records received to the Court and the defendant upon receipt.

Case 1:13-cr-00986-LTS   Document 298   Filed 07/21/20   Page 7 of 12

Page 7

car phone." Ex. A at 25 (emphasis added). That alone provides strong evidence that the defendant was charged with a violation of Section 3701(a)(1)(ii), which is a crime of violence.

Second, the record of the defendant's plea is consistent with a finding that he was convicted of violating sub-section (a)(1)(ii) because the record of the plea makes clear that the defendant pled guilty to robbery as a first-degree felony, or Robbery "F1." Ex. A at 2. As noted above, only three of the statute's five sub-divisions qualify as first-degree felony, including sub-division (a)(1)(ii). *See* 18 Pa. Cons. Stat. § 3701(b) ("Robbery under subsection (a)(1)(iv) is a felony of the second degree; robbery under subsection (a)(1)(v) is a felony in the third degree; otherwise, it is a felony of the first degree."). That reading of the document is corroborated by the potential penalties listed on the same document that resulted from the guilty plea, namely "not less than (5) years," a mandatory minimum that, as noted above, only applied to first-degree felony robbery. *Id.* The defendant's criminal history, which was produced to the defendant in discovery and which is contained, in relevant part, in the PSR further confirms the defendant in fact received the five-year mandatory minimum applicable only to first-degree felony robbery.

Third, as discussed further below, the defendant was also charged with a robbery conspiracy count, to which the defendant also pled guilty. (Ex. A at 23-24). According to the criminal information, the object of the conspiracy was "robbery, theft, assault, threats" and the overt act listed is "held gun on victim" conduct which is entirely consistent with robbery conspiracy whose object was to violate of sub-section (a)(1)(ii) but would be inconsistent with a conspiracy whose object as a violation of sub-section (a)(1)(i), which requires an allegation that the defendant *inflicted* serious bodily injury on another. It would also be inconsistent with an alleged violation of sub-section (a)(1)(iii), which covers a defendant who in the course of committing a theft, commits or threatens immediately to commit any felony of the first or second degree. Here, while the defendant was charged with assault and making terrorist threats, he only charged with misdemeanor counts of those offenses, not felonies.[5] Ex. A at 25. As such, on this record, the conspiracy count would not properly allege a robbery conspiracy whose object was to violate sub-section (a)(1)(iii). By contrast, it would properly allege a conspiracy to violate sub-division (a)(1)(ii), the same sub-division identified in the complaint.

Read in tandem, thus, the charging instruments and the record of the guilty plea strongly support the conclusion that the defendant was convicted of first-degree robbery in violation of Section 3701(a)(1)(ii), which, as noted above, is a crime of violence. *See Heng Khim*, 748 F. App'x at 444. *Cf. Blair*, 734 F.3d at 226 ("Reading each charging document and guilty plea as a

---

[5] It bears mention that this fact alone substantially undercuts the notion that the defendant was charged under or plead guilty to first-degree robbery in violation of sub-division (a)(1)(iii), as opposed to (a)(1)(ii). The plain language of subdivision (a)(1)(iii) requires an allegation that the defendant, in the "course of committing a theft… commits or threatens immediately to commit any felony of the first or second degree." On these facts, that would require reading the record to allege that in the course of committing the robbery, the defendant committed the felony of robbery conspiracy, a reading that while theoretically possible, seems far less natural and supported by the record than a reading of the same documents as alleging the violation of sub-division (a)(1)(ii) expressly set forth in the criminal complaint.

whole, as the District Court did, it is clear that Blair 'pled guilty to [each such] robbery charge on May 6, 1991, as a felony of the first degree, thereby admitting that he used force causing serious bodily injury or threatened to do so and/or threatened to commit aggravated assault in the process of committing the robbery.' That is the sensible conclusion of the analysis long permitted by the modified categorical approach . . . .")

But second, even assuming the record leaves some ambiguity as to whether the defendant pled guilty to first-degree robbery by violating sub-division (a)(1)(i), (a)(1)(ii), or (a)(1)(iii), on this record any such ambiguity should be irrelevant because each subdivision would constitute a "crime of violence." With respect to sub-divisions (a)(1)(i) and (a)(1)(ii), as noted above, there can be no serious question either constitutes a "crime of violence" under the modified categorical approach. With respect to sub-division (a)(1)(iii) – which, as noted, covers a robbery during which the defendant "commits or threatens immediately to commit any felony of the first or second degree" – and while it is true that "some felonies of the first and second degree involve no violence," *Blair*, 734 F.3d at 225, as discussed above the record as a whole strongly supports the conclusion that the felony at issue was a conspiracy to commit robbery in violation of sub-division (a)(1)(ii), which is a crime of violence.

*Blair* is instructive. There, as here, the *Shepard* documents made clear that the defendant was convicted of first-degree robbery under Section 3701(a)(1). However, in *Blair* the same documents did not indicate which of the three-applicable sub-divisions – that is, (a)(1)(i), (a)(1)(ii), or (a)(1)(iii) – the defendant had pled guilty to. The Third Circuit rejected the defendant's argument that this ambiguity was a fatal flaw because it held that the district court could and should look to very same *Shepard* documents to determine what the relevant first or second degree felony was and, on those facts, it found that the same *Shepard* "documents that the District Court had reviewed as part of the modified categorical analysis plainly state that the felonies associated with his 1991 robbery convictions were 'aggravated assault'" which was a crime of violence. *Blair*, 734 F.3d at 225.

Here, as noted above, the only felony associated with the robbery charge was a robbery conspiracy charge. Ex. A at 24. More precisely, as detailed above, the object of that felony robbery conspiracy appears to be a conspiracy to commit robbery by violating sub-division (a)(1)(ii), *i.e.*, the same sub-division alleged in the original charging instrument, which is a crime of violence. Because, as discussed herein, the Guidelines themselves make clear that a "crime of violence" includes a conspiracy to commit the same offense, *see* U.S.S.G. § 4B1.2 cmt. n. 1, on this record the Court can and should find that even assuming the *Shephard* documents leave an ambiguity as to which of the three sub-sections giving rise to a first-degree felony robbery count the defendant was convicted of, those same documents establish that even under the least culpable such sub-section, (a)(1)(iii), the defendant would still have been convicted of a crime of violence.

In sum, the state court records, while not as complete as a federal record might be, are nonetheless sufficient to establish that the defendant's first-degree robbery conviction was a crime of violence for purposes of Section 4B1.2. The defendant's argument to the contrary, which relies solely on the absence of state records that have now been obtained, is meritless.

### B. The Hobbs Act Robbery Count Remains a Crime of Violence For Purposes of Section 4B1.1 and 4B1.2

Next, the defendant contends based on scant authority that his conviction on Count Two is no longer a "crime of violence" for purposes of Section 4B1.1 and 4B1.2 because Count Two was a conspiracy count, not a substantive count. The argument is baseless.

As an initial matter, and as the defendant appears to concede, application note 1 to the Section 4B1.2 expressly states that a crime of violence, which the defendant does not appear to dispute would include a substantive Hobbs Act robbery count, also includes "the offense[] of . . . *conspiring* . . . to commit such offenses." U.S.S.G. 4B1.2 app. n. 1 (emphasis added). Since the defendant was convicted of conspiracy to commit a Hobbs Act robbery, the application note leaves little doubt that Count Two qualifies as a "crime of violence" under Section 4B1.2.

Nevertheless, based principally on an unpublished summary order, the defendant suggests that commentary to the Guidelines might be invalid. *See United States v. Swinson*, 797 Fed.Appx. 589, 602 (2d Cir. 2019) (remanding on other grounds and leaving for the district court, in the first instance, the defendant's challenge to the validity of commentary note 1). Specifically, the defendant argues that commentary note 1 "contradict[s] the plain text of the career offender Guidelines which do not apply to conspiracies" (Def. Sub. at 15) (citing *Stinson v. United States*, 508 U.S. 36 (1993)).

However, since the *Swinson* summary order, the Second Circuit has twice, in published opinions reached the issue and reached the opposite conclusion, affirming the ongoing validity if commentary note 1. *See, e.g.*, *United States v. Tabb*, 949 F.3d 81, 89 (2d Cir. 2020) (rejecting similar challenge to application note 1 in narcotics conspiracy case because it "is patently evident that Application Note 1 was intended to and does encompass Section 846 narcotics conspiracy. Tabb's conviction under this statute thus properly served as a predicate for his sentencing enhancement."); *United States v. Richardson*, 958 F.3d 151, 155 (2d Cir. 2020) (reaching same conclusion and holding that "Application Note 1 is not 'inconsistent with, or a plainly erroneous reading of' § 4B1.2. *Stinson*, 508 U.S. at 38."); *see also United States v. Jackson*, 60 F.3d 128, 131 (2d Cir. 1995). (dismissing the argument that "the Sentencing Commission exceeded its statutory mandate . . . by including drug conspiracies as controlled substance offenses").[6]

Moreover, while both *Tabb* and *Richardson* involved application of commentary note 1 to the definition of a "controlled substance offense" rather than to a "crime of violence," there is no reason (and certainly the defendant identifies none) why the logic of both rulings should not apply with equal force in the context of a crime of violence. Commentary note 1 itself makes no distinction between the two different kinds of predicate offenses, and the reasoning of both cases in upholding commentary note 1 as an appropriate exercise of the Commission's authority

---

[6] To the extent the defendant seeks to rely on the D.C. Circuit's Opinion in *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018), that opinion is not the law of this Circuit. *See, e.g.*, *Tabb*, 949 F.3d at 87 (noting that the D.C. Circuit and Sixth Circuit have reached the opposite conclusions); *cf. Richardson*, 958 F.3d at 155 (noting that the Second Circuit's conclusion "accords with the majority of circuits that have addressed the question").

similarly applies with equal force in the context of a "crime of violence." *See, e.g.*, *Taub*, 949 F.3d at 88 (noting the Commission's authority to expand the Guidelines to encompass conspiracies, not just substantive counts, in other contexts such as Section 2X1.1, and thus that rejecting the validity of Commentary Note 1 "would . . . require finding that term 'conspiracy' includes . . . narcotics conspiracy in some parts of the guidelines . . . but not others"); *Richardson*, 958 at 155 ("The Sentencing Commission adopted an interpretation of § 4B1.2 that is not inconsistent with the guideline when it concluded that an offense that forbids 'aiding and abetting, conspiring, and attempting to' [engage in a] controlled substance is an offense that 'prohibits' those activities.")[7]

In sum, Commentary Note 1 makes clear that the defendant's conviction on Count Two is sufficient to render him a Career Offender within the meaning of the Guidelines, the Second Circuit as now repeatedly upheld the validity of Commentary Note 1, and consistent with the finding of the Probation Department, the Court should reject this challenge to the defendant's Guidelines calculation as well.

### III. Discussion

For substantially the reasons set forth in the Government's original sentencing memorandum (Dkt. 218) and those found by the Court in previously imposing sentence, the Government respectfully submits that a sentence of 180 months' imprisonment remains appropriate on these facts and sufficient but not greater than necessary to promote the legitimate ends of sentencing. Such a sentence remains within the revised, applicable Guidelines range of 151-188 months' imprisonment and remains appropriate even assuming the Court adopts the defendant's Guidelines calculation of 57-71 months' imprisonment.[8]

As an initial matter, the Government notes that aside from challenging the Guidelines calculation, which indisputably has changed since the original sentencing proceeding, the defendant does little to identify facts or arguments not raised at the original sentencing and considered by the Court in previously imposing sentence. Nor does he provide the Court with

---

[7] While the language of Section 4B1.2(a) unlike 4B1.2(b) does not use the word "prohibit" to define a crime of violence, there can be no serious question that the purpose of any law banning conduct that qualifies as a crime of violence – such as the Hobbs Act statute – is intended to "prohibit" such conduct.

[8] The Government respectfully submits that the Guidelines – which the Government certainly does not dispute should be accurately calculated by the Court at sentencing – are, at this point, a somewhat artificial benchmark for the defendant's conduct in this case, given that they result from a plea agreement which, when entered into by the parties, contemplated a sentencing proceeding at which the defendant would be held responsible for a Section 924(c) count and would face an applicable Guidelines range of 262-327 months' imprisonment. Had *Davis* been decided at the time, there can be little dispute the same plea offer would not be made because it does not capture the defendant's conduct in this case. That is particularly true given that the same evidence establishing the defendant's guilt as to Count Two, the sole remaining count at this point, would establish his guilt as to Counts One and Three (and their combined fifteen-year mandatory minimum).

reason to revisit its extensive and detailed evaluation of the Section 3553(a) factors, factors which weigh heavily in favor of reimposing a sentence of 180 months' imprisonment.

First, with respect to the nature and seriousness of the offense conduct, as detailed extensively above and as previously found by this Court, the defendant's conduct was extremely serious. The defendant helped to organize what he believed would be an armed robbery of rival drug dealers. And while the defendant contends the seriousness of the defendant's conduct is "somewhat mitigated by the fact that in reality it was a sting operation," (Def. Sub. at 17), as this Court noted in rejecting the exact same argument at the original sentencing:

> The potential monetary proceeds advertised were huge, but even if Mr. Chappelle was ultimately drawn to this particular fake job by the amount of potential profit, the fact remains that he chose not only to offer himself as a participant, but to help in the recruitment of others, and he deliberately and enthusiastically touted his own experience with and access to the drug trade and guns.
>
> He came to New York with loaded firearms prepared to kill if necessary to get the drugs. No government agent or cooperator made him do that, it was his own choice. He endangered the public and his female codefendant, and he will pay a heavy price for that choice.

(Dkt. 225 at 31).

Second, with respect to the history and characteristics of the defendant, and irrespective of the Court's resolution of the legal challenges his Guidelines calculation, there can be no serious question that the defendant is a career offender in any lay sense of the term. This is the defendant's fifth conviction, having sustained two prior convictions for unlawful possession of a firearm; the 1996 Pennsylvania robbery conviction detailed above; and a prior federal narcotics conviction. (PSR ¶¶ 46-49). All five of the defendant's convictions involved guns, threats of violence, narcotics trafficking or some combination thereof. Moreover, none of the sentences imposed for those offenses, individually or collectively, were sufficient to deter the defendant from engaging in the instant offense.

Moreover, the defendant has no significant history of living a law abiding life as an adult. In connection with his original sentencing, the defendant reported just several sporadic bouts of legitimate employment each lasting several months. (*Id.* ¶¶ 81-84). The defendant has no savings or assets, nor any identified job prospects should be released immediately. In the instant submission, the defendant notes his difficult upbringing, narcotics addition and lack of family structure, all of which undoubtedly contributed to his difficulties as an adult, but all of which will be there to face him upon his release. And while the defendant's efforts to better himself while incarcerated are commendable, they are not a substitute for the role incarceration has played and should continue to play in protecting the community from further crimes of this defendant.

Additionally, the defendant's suggestion that a reduced sentence is necessary to avoid unwarranted sentencing disparities ignores the myriad fact and defendant-specific considerations that go into any particular sentencing. The Government is equally able to point to defendants in

robbery sting cases who received sentences substantially longer than the 180-month sentence imposed on this defendant. *See, e.g.*, *United States v. Cook et al.*, 13 Cr. 777 (AJN) (three defendants in substantially similar robbery sting case who received sentences of 240 months, 224 months, and 216 months respectively). None of these warrant revisiting the sentence imposed on this case and this defendant based his conduct and criminal history.

### IV. Bail

Finally, and for substantially the reasons set forth above, the Court should deny the defendant's request for bail. As the defendant concedes, those arguments turn almost exclusively on his arguments about the applicable Guidelines range, arguments that are contrary to the Guidelines calculation completed by the Probation Department and which, as discussed above, are erroneous as a matter of law. At bear minimum, the Government respectfully submits that the Court should resolve the significant legal issues raised above before considering the defendant's bail application.

Moreover, to the extent the defendant seeks to rely on the recent COVID-19 pandemic, the defendant identifies no reason to believe he is differently situated than the tens of thousands of other inmates currently housed by the BOP. The defendant identifies no medical issues or other personal circumstances that render him at heightened risk, nor is there any reason to believe that FCP Canaan, where the defendant is currently housed – and which has had a total of five COVID cases total since the outbreak began [9] – is not taking the pandemic seriously or faithfully implementing BOP policies intended to prevent the spread of the disease and ensure inmate safety. To the contrary, the limited number of cases at the facility – and the ability of the facility to prevent a much more substantial outbreak – strongly support the opposite conclusion

### V. Conclusion

In sum, because the defendant's conduct remains the same, because his criminal history – and the corresponding need to deter this defendant and protect society from further crimes by this defendant – remains the same, the Government respectfully submits that a sentence of 180 months' imprisonment remains sufficient but not greater than necessary to promote the legitimate ends of sentencing.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: \_\_\_\_/s/_____
Edward B. Diskant
Assistant United States Attorney
Tel: 212-637-2294

Cc: Defense counsel (via ECF)

---

[9] *See* https://www.bop.gov/coronavirus/ (last visited July 21, 2020).